# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | |
|---|---|
| **FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver for AMERICAN UNITED BANK,** ] | |
| ] | |
| **Plaintiff,** ] | |
| ] | |
| **v.** ] | **CIVIL ACTION FILE NO.:** |
| ] | |
| **T. GLENN THOMPSON, JOEL C. TAYLOR, SURINDER BAHL, JAMES M. JETT, PULUKOTTIL I. JOY, GURSHARAN PANNU, KANTI B. PATEL, WILLIAM F. RUBIN,** ] | _____ |
| ] | |
| ] | **JURY DEMAND** |
| ] | |
| ] | |
| **Defendants.** ] | |

---

## COMPLAINT

---

Federal Deposit Insurance Corporation ("FDIC"), as Receiver ("FDIC-R") for American United Bank ("AUB" or the "Bank"), hereby files its Complaint against the Defendants, showing the Court as follows:

## I.    INTRODUCTION

1.    On October 23, 2009, the Georgia Department of Banking and Finance ("GDBF") closed AUB and appointed FDIC-R as receiver.  The loss to the

Deposit Insurance Fund is currently estimated at $45.2 million.  Under 12 U.S.C. § 1821(d)(2)(A) and § 1823(d)(3)(A), the FDIC-R has, among other powers, all rights, titles, powers, and privileges of AUB, and of account holders, depositors, and stockholders with respect to AUB and its assets, including, but not limited to, the claims against the former directors and officers as set forth herein.

2.      FDIC-R asserts claims against two former AUB officers (the "Officer Defendants"), to wit, Defendants T. Glenn Thompson ("Thompson") and Joel C. Taylor ("Taylor"), and six former directors (the "Director Defendants"), to wit, Surinder Bahl ("Bahl"), James M. Jett ("Jett"), Pulukottil I. Joy ("Joy"), Gursharan Pannu ("Pannu"), Kanti B. Patel ("Patel"), William F. Rubin ("Rubin"), and T. Glenn Thompson, (collectively Thompson, Taylor, Bahl, Jett, Joy, Pannu, Patel, and Rubin are referred to as the "Defendants") for negligence and gross negligence in operating and managing the lending function of the Bank.  The FDIC-R seeks compensatory damages and other relief as a result of Defendants' tortious conduct (the "Damages").

3.      Collectively, the Defendants were charged with, among other responsibilities, the responsibility of operating and managing the lending function of a community bank.  But rather than manage the Bank's lending function in a sound and responsible manner, the Defendants took unreasonable risks with the

Bank's loan portfolio, allowed irresponsible and unsustainable rapid asset growth concentrated in high-risk and speculative acquisition, development, and construction ("ADC") and commercial real estate ("CRE") loans and loan participations, disregarded regulator warnings regarding lending activities, violated the Bank's loan policies and procedures, and knowingly permitted poor underwriting in contravention of the Bank's policies and reasonable industry standards.

4.      Each of the Defendants also routinely and regularly recommended and/or affirmatively voted to approve loans, purchase participations and other extensions of credit without adequately informing themselves of the relevant risks in connection with the approval of loans, failed to prevent violations of AUB's loan policies, and failed to prevent the approval of loans they knew or should have known would likely cause the Bank to suffer substantial damages.

5.      Among other problems, the Defendants approved the purchase of interests in a number of loans, many of which were at or very near the Bank's legal lending limit, without AUB having conducted its own underwriting of the loans. Instead, the Defendants improperly approved these purchases based on at best outdated or inadequate underwriting by other institutions.

6.      As described in detail below, the Defendants' negligence and gross

negligence in their numerous, repeated, and obvious breaches and violations of the Bank's loan policy and procedures, underwriting requirements, banking regulations, and prudent and sound banking practices are exemplified by 10 loans made between February 14, 2006, and September 25, 2007, which proximately caused Damages to the Bank of an amount to be proven at trial in excess of $7.3 million.

## II.   <u>THE PARTIES</u>

7.     FDIC-R is an instrumentality of the United States of America, established under the Federal Deposit Insurance Act, 12 U.S.C. §§ 1811-1833(e), with its principal place of business in Washington, D.C.   12 U.S.C. § 1821(d). FDIC-R is the successor to all rights, titles, powers, and privileges of AUB, and of account holders, depositors, and stockholders with respect to AUB and its assets, including, but not limited to, the claims against the former directors and officers as set forth herein.

### A.     Officer Defendants

8.     Thompson was the President, Chief Executive Officer ("CEO") and a director for AUB from November 29, 2004, until he retired on July 31, 2009. Thompson was a member of the Loan Committee ("LC") from January 11, 2005, to March 13, 2007, and from June 3, 2008, until he retired on July 31, 2009.

4

9.     Taylor was the former Senior Vice President ("SVP") from August 21, 2006, until he was promoted to Chief Lending Officer ("CLO") on March 21, 2008, and a member of the LC from May 27, 2008, until he was terminated on November 19, 2008.  Taylor originated and recommended many problem loans that resulted in losses to the Bank.

### B.     Director Defendants

10.     As described more specifically below, each of the Director Defendants was a member of the Bank's LC.

11.     Bahl was a member of the LC from January 11, 2005, until May 27, 2008.  He was a director from November 29, 2004, until May 27, 2008.

12.     Jett was a member of the LC from January 11, 2005, until October 2009.  He was a director from November 29, 2004, until the Bank failed.

13.     Joy was a member of the LC from January 11, 2005, until he resigned on August 4, 2009.   He was a director and Chairman of the Board until his resignation.

14.     Pannu was a member of the LC from January 11, 2005, until May 27, 2008.  He was a director from November 29, 2004, until May 27, 2008.

15.     Patel was a member of the LC from February 8, 2005, until May 27, 2008.  He was a director from November 29, 2004, until May 27, 2008.

16.     Rubin was a member of the LC from February 8, 2005, until May 27, 2008.  He was also a director from November 29, 2004, until May 27, 2008.

III.   **JURISDICTION AND VENUE**

17.     This Court has subject matter jurisdiction over this case pursuant to: 12 U.S.C. § 1819(b)(1) and (2); 12 U.S.C. § 1821(d) and (k); and 28 U.S.C. §§ 1331 and 1345.

18.     This Court has personal jurisdiction over the Defendants who at all relevant times were residents of, and conducted the business of the Bank, in the State of Georgia.

19.     Venue is proper in this district under 28 U.S.C. § 1391(b), because a substantial portion of the events and/or omissions giving rise to the claims and Damages asserted herein occurred in this district.

IV.   **FACTS**

20.     AUB was headquartered in Lawrenceville, Georgia, and opened for business on December 20, 2004, as a state non-member bank.  AUB was wholly owned by American United Bancorp, Inc., a one-bank holding company.  AUB operated a single office located roughly 25 miles north of Atlanta, Georgia.

A.     **The Bank's Lending Operations and Concentrations**

21.     Loan underwriting practices are the primary determinant of bank

6

credit risk and bank credit availability and one of the most critical aspects of loan portfolio management.  Loan underwriting standards define the bank's desired level of creditworthiness for individual loans and provide uniform criteria for evaluating loans with similar characteristics.  It is also important in protecting the bank's capital which can erode from unsafe and unsound lending practices.

22.    Underwriting practices (which are described in Part 364 and 365 of the FDIC Rules and Regulations) can generally be characterized by the criteria used to qualify borrowers, loan pricing, repayment terms, sources of repayment, and collateral requirements.   Underwriting practices also encompass the management and administration of the portfolio, including its growth, concentrations in specific markets, out-of-area lending, written lending policies and adherence to written underwriting policies.

23.    The foremost means to control loan quality and a good loan portfolio is by the loan approval process.  An effective loan approval process establishes minimum requirements for the information and analysis upon which a credit decision is based.  The purpose of a loan approval process is to provide controls to ensure acceptable credit at origination.

24.    Risk diversification is a basic tenant of portfolio management.  12 C.F.R. § 30, "Standards for Safety and Soundness" (appendix B), requires banks to

accord adequate consideration to concentrations of credit risk in their underwriting practices.

25.     Soon after AUB opened, the Defendants caused the Bank to pursue an aggressive loan growth strategy focused on CRE loans, specifically ADC loans and loan participations.  In doing so, Defendants substantially deviated from AUB's original business plan.

26.     The Bank grew rapidly with annual loan growth rates of 153 percent in 2005 and 143 percent in 2006.

27.     Between December 2005 and June 2009, the Defendants increased CRE lending from $7 million to $45 million (peaking at $54 million during 2007) and ADC lending from $10 million to $36 million.  By June 30, 2007, the level of CRE and speculative residential construction loans totaled $62.1 million and represented 642 percent of the Bank's tier 1 capital.  The level of CRE loans as of June 30, 2007, was almost twice the level AUB had projected.  CRE and ADC loans are known to be more speculative than other types of loans because, among other reasons, of the lack of present cash flow sources, uncertainties of development and sale, and the need for adequate secondary sources of repayment. Prudent lending in this segment of banking requires sound underwriting, timely evaluation and response to economic trends impacting the industry and strict

adherence to prudent lending policies and standards, all of which the Defendants failed to do.

28.    In over concentrating the Bank's loan portfolio in CRE and ADC loans, the Defendants also effectively "turned a blind eye" to AUB's Loan Policy and prudent underwriting standards which recognized the need to closely monitor concentrations for adverse financial or economic conditions, stated that concentrations would be limited, and established guidelines for concentrations based on the perceived risk.

29.    Defendants knew or should have known that concentrating a loan portfolio in CRE/ADC loans increases a bank's risk for numerous reasons, including: (a) concentration in any sector of the economy increases risk resulting from that sector's downturn; (b) the housing market, in particular, is cyclical by nature; (c) the primary source of repayment is cash flow from the sale of the real estate collateral; and (d) historically, bank failure rates closely correlate with high CRE/ADC concentrations.  In short, concentrations of CRE/ADC loans in the volatile commercial real estate market render a bank vulnerable to changes in market conditions and require vigilant adherence to sound lending practices.  It is imperative that the known risks inherent in such high loan concentrations be managed by, at a minimum, management oversight, strategic planning,

9

underwriting, risk assessment and monitoring of CRE/ADC loans, portfolio risk management, management information systems, market analysis, and stress testing.

30.    The Defendants were regularly provided with information of key economic indicators, such as housing sales and home prices, which were used in the underwriting process.  Despite receiving information showing a slowing of housing sales and peaking of home prices by early 2006, Defendants continued to approve high risk and speculative ADC and CRE loans, including the transactions which resulted in the Damages.

31.    By 2007, the Bank suffered a significant decline in asset quality. Despite this decline in asset quality and increasing negative economic indicators, the Defendants continued to approve ADC and CRE loans, including a number of the loans that resulted in the Damages suffered by the Bank.

32.    Further increasing AUB's risk profile was the Bank's difficulty in originating loans and Defendants' decision to include a significant number of purchased participation loans in its loan portfolio.  Defendants were repeatedly warned regarding the extent of those participation loans and the lack of adequate risk management controls.

33.    Exacerbating loan portfolio mismanagement and loan underwriting

deficiencies, the Defendants continued to approve CRE and ADC loans between 2006 and 2008 in the face of deteriorating economic conditions, without hiring a qualified CLO - despite the direction of the GDBF to hire one.  In October 2006, Thompson requested that the GDBF approve Taylor to be the CLO.  GDBF denied his request, stating that "it does not appear that Taylor possesses the qualifications necessary to be the Senior Lender and CLO for the Bank."  Despite the GDBF's rejection, Thompson appears to have installed Taylor as *de facto* CLO from the commencement of his employment until his formal appointment at the Board meeting on March 11, 2008.

34.    As AUB's loan portfolio grew, the concentration of CRE and ADC loans to Total Capital increased the risk to the Bank and, as the quality of those loans deteriorated, AUB's capital levels and earnings eroded.

35.    Director Defendants and Thompson, among other things, did not limit the Bank's exposure to CRE and ADC concentrations and purchased participations, allowing the Bank to grow significantly without risk limits and monitoring practices commensurate with the increased risk associated with AUB's loan portfolio. The Director Defendants likewise failed to limit the Bank's exposure to CRE and ADC concentrations and purchased participations which

11

created an undue financial risk to the Bank due to the lack of adequate risk management controls.

36.     Between 2005 and 2008 the Defendants were repeatedly warned by regulators about, among other things: lack of adequate risk management controls, excessive level of purchased participations, over concentration of CRE/ADC loans, lack of a qualified chief lending officer, deficiencies in loan underwriting and credit administration, including but not limited to, inadequate documentation and loans in excess of loan-to-value ("LTV") limits.  The Defendants failed to heed the regulators' warnings.

37.     When deteriorating real estate market conditions substantially reduced the appraised value of collateral supporting its CRE and ADC loans, AUB's asset quality declined.  The Bank's adversely classified assets increased from $4 million as of June 30, 2007, to $33 million as of March 31, 2009.   All but $1.2 million were CRE loans.  This resulted in a net loss to AUB of $6.9 million as of September 30, 2009, and a significant decrease in its regulatory capital.

38.     Due to the deficient underwriting, risk management, and credit administration allowed by the recommended Defendants in approving CRE loans, AUB was fatally exposed to the inevitable cyclical decrease in real estate values.  As real estate markets declined, the Bank's financial condition declined.   On

October 23, 2009, GDBF closed the Bank and the FDIC-R was appointed Receiver.

### B.    Loan Underwriting and Violations

39.    AUB had specific written policies and procedures governing the underwriting, acquisition and administration of loans (the "Loan Policy"). The Loan Policy was intended to ensure that the Bank pursued prudent banking practices and to limit the Bank's risk exposure. The relevant Loan Policy provisions include, but are not limited to:

1. All construction loans require analysis of the financial strength of the borrower, including the borrower's personal financial statements, current credit reports, tax returns, and a global cash flow.

2. The borrower is required to make an equity investment.

3. Purchase of a loan participation requires analysis in accordance with AUB's credit standards as if AUB originated the loan itself, including, but not limited to, an analysis of collateral quality and a credit file.

4. Loan-to-value ratio limits are 80 percent for new commercial and residential construction loans; 75 percent for land development loans; and 65 percent for raw land loans.

5. Guarantor creditworthiness, including through a global cash flow analysis, as well as a secondary repayment source must be verified before closing.

6. Construction loans shall only be made to a builder with financial stability and proven experience.

7. All construction loans must be secured by a first lien on the subject property, and collateral must be properly valued.

8. A complete appraisal prepared by a qualified appraiser in accordance with the Uniform Standards of Professional Appraisal Practice is required for each parcel of real property collateral before a final credit decision is made. The appraisal must be current – *i.e.,* within six months of the loan closing and updated as required by market conditions.

9. The Bank should decline "undesirable loans," which include loans to new businesses when repayment depends on the profitable operation or liquidation of the business.

10. Acquisition and development loans must be supported by a cost estimate, and a complete analysis, including absorption, market area, inventory, housing starts, and a developer experienced in coordination of physical development and marketing of finished lots.

Loan approval authorities, which were based on the total credit amount outstanding to the borrower at the time of approval, were as follows:

1. President-CEO and CLO each: $250,000 secured and $25,000 unsecured.

2. President-CEO and CLO together: $500,000.

3. LC: legal lending limit.[1]

40. As detailed herein, the Bank suffered substantial damages from significant departures from safe and sound banking practices by the Defendants.

---

[1] The Georgia statutory legal lending limit for secured loans is 25 percent of the bank's statutory capital base. The precise dollar amount of AUB's legal lending limit is not identified either in the Bank's Loan Policy or in examination reports during the time the loss loans were approved.

Each of the Defendants repeatedly disregarded the Bank's Loan Policy and approved loans and loan participations involving borrowers who were not creditworthy and/or projects that provided insufficient collateral and guarantees for repayment.  Defendants repeatedly engaged in a pattern and practice of approving loans and loan purchases that: 1) violated the Bank's Loan Policy, including, without limitation, the policy provisions in paragraph 39 above; 2) evidenced systematic deficiencies in the credit underwriting, approval, and administration process; and 3) violated sound and prudent banking practices including, but not limited to, the general safety and soundness and underwriting standards of 12 C.F.R. § 364.101, Appendix A, and the real estate lending standards of 12 C.F.R. § 365.2, Appendix A.

41.    Approvals of the following loans and loan participations illustrate, but are not exhaustive of, the types of failures, breaches, and violations of duty that each of the Defendants committed that damaged the Bank, and that constitute negligence and gross negligence either separately or together as a pattern or practice.  (The loans and loan participations are described using initials for privacy reasons.  The full names will be identified to the Defendants.)

42.    On February 14, 2006, Jett, Joy, Pannu, Patel, Rubin, and Thompson unanimously voted to approve a $650,000 loan to **I.I.** to enable its principal, R.U.,

15

to buy out his business partner in two restaurants.  Approving this loan violated the Loan Policy, underwriting requirements, and safe and sound banking practices in at least the following respects: LTV violations; insufficient collateral; borrower and guarantor were not valid repayment sources; no global cash flow analysis; failure to secure appraisals on collateral, and; failure to ascertain the cash surrender value of the guarantor's life insurance policy pledged as collateral.  The negligent and grossly negligent approval of the loan resulted in substantial damages to the Bank and FDIC-R in an amount to be proved at trial.

43.    On April 11, 2006, Bahl, Jett, Joy, Patel, and Thompson unanimously approved the request for the purchase of $1,600,000 participation interest in a $7,600,000 residential construction guidance line originated by Haven Trust Bank for **M.P.**  The purpose of the loan was to provide funds for the construction of 7 residential homes and the purchase of 25 lots in South Forsyth County.   AUB purchased a $1,361,300 or 20 percent interest in the loans funded to M.P. Approving this loan participation violated the Loan Policy, underwriting requirements, and safe and sound banking practices in at least the following respects: no independent underwriting by AUB; no personal guaranties were obtained; no global cash flow analysis on the borrower; no credit report was obtained for the borrower; no tax returns were obtained from the borrower; no

financial statements were obtained from the borrower; no independent appraisals were obtained, and appraisal reviews were not conducted in compliance with policy; no market or subdivision analysis was performed, and; no business plan was obtained from the borrower.  The negligent and grossly negligent approval of the loan resulted in substantial damages to the Bank and FDIC-R in an amount to be proved at trial.

44.   On January 9, 2007, Taylor presented, and Bahl, Joy, Pannu, Patel, Rubin, and Thompson unanimously approved, a $3,330,750 loan to **C.S.C.** subject to AUB securing a participation agreement in the amount of $1,130,750 and an appraisal review.  The purpose of the loan was to construct a self-storage facility. Approving this loan participation violated the Loan Policy, underwriting requirements, and safe and sound banking practices in at least the following respects: no independent underwriting by AUB; the loan was outside the Bank's trade area; no borrower equity in transaction; borrower and guarantors not valid repayments sources; no sound financial analysis performed; guarantor was only 50% owner of identified assets; insufficient debt service coverage;  construction cost exceeded loan amount by $1.1 million thus the project was underfunded; cash flow projections were based on unsupported data with no interest reserve during construction; no market analysis performed; the debtor had existing storage facility

in immediate proximity which was only 78% occupied, and; loan violated policy of only extending bank maximum loans for exceptionally strong credits, loan rated "4" from the outset. The negligent and grossly negligent approval of the loan resulted in substantial damages to the Bank and FDIC-R in an amount to be proved at trial.

45.   On March 3, 2007, Taylor presented, and Bahl, Jett, Joy, Pannu, Patel, and Thompson unanimously approved, a $1,080,000 loan to **R.P.**, a newly formed entity, for the acquisition, development, and construction of two speculative houses in Atlanta, Georgia.   The approval was subject to an appraisal review, environmental audit, and finding a participating bank because the total exposure related to the guarantor exceeded AUB's internal lending limit.   Approving this loan violated the Loan Policy, underwriting requirements, and safe and sound banking practices in at least the following respects: the  borrower and guarantor were not valid repayment sources as the borrower had no earnings history, and the guarantor had insufficient income amounts for three previous years with insufficient cash on hand; the loan was originated for a 12 month term instead of 9 months as required by policy; no appraisal review was completed; no market or subdivision analysis was performed; no business plan was obtained from the borrower, and; the Bank failed to secure a participant bank as required and thereby

18

exceeded its lending limits.  The negligent and grossly negligent approval of the loan resulted in substantial damages to the Bank and FDIC-R in an amount to be proved at trial.

46.    On April 3, 2007, Taylor presented, and Jett, Joy, Pannu, Patel, and Rubin approved, a $598,733 loan to **G.T.P.**, to finance the construction of a speculative home.  Approving this loan violated the Loan Policy, underwriting requirements, and safe and sound banking practices in at least the following respects: the borrower and guarantor lacked experience in residential development; the borrower and guarantor were not valid repayment sources as the borrower had no earnings history, and the guarantor had insufficient income amounts for three previous years with insufficient cash on hand; no global cash flow analysis on the guarantor; the project was underfunded by over $850,000; the loan was originated for a 12 month term instead of 9 months as required by policy; no market or subdivision analysis was performed, and; no business plan was obtained from the borrower.  The negligent and grossly negligent approval of the loan resulted in substantial damages to the Bank and FDIC-R in an amount to be proved at trial.

47.    On April 10, 2007, Taylor presented, and Jett, Joy, Pannu, Patel, and Rubin unanimously approved, a $5,240,000 loan to **G.P.D.** to fund the acquisition and development of a mixed-use residential and retail construction project.  AUB

sold a 58 percent participation to First National Bank of Georgia, allowing AUB to fund only $2.2 million.   Approving this loan violated the Loan Policy, underwriting requirements, and safe and sound banking practices in at least the following respects: the borrower and guarantor lacked experience in mixed use development; the guarantor was not a valid repayment source as the guarantor had insufficient income amounts for three previous years with insufficient cash on hand; no global cash flow analysis was performed for the borrower or guarantor; the project was underfunded at approval by $2.2 million; no market or subdivision analysis was performed, and; no business plan was obtained from the borrower. The negligent and grossly negligent approval of the loan resulted in substantial damages to the Bank and FDIC-R in an amount to be proved at trial.

48.    On May 1, 2007, Taylor presented, and Jett, Joy, Pannu, Patel, and Rubin unanimously approved, a $4.2 million guidance line of credit ("LOC") to **H.C.L.,** for the purpose of financing short-term construction or rehab loans on residential properties to third-party borrowers.   AUB sold a $2 million or 47.62 percent participation interest in the loan to Haven Trust Bank, allowing AUB to only fund $2.2 million of the LOC.   Approving this loan violated the Loan Policy, underwriting requirements, and safe and sound banking practices in at least the following respects:   no borrower financial statements were obtained; no global

cash flow analysis was performed on the borrower or guarantors, and; failure to obtain appraisals of all properties securing the LOC, resulting in the inability to determine the total value of the collateral and loan-to value compliance.  The negligent and grossly negligent approval of the loan resulted in substantial damages to the Bank and FDIC-R in an amount to be proved at trial.

49.    On May 1, 2007, Taylor presented, and Jett, Joy, Pannu, and Patel unanimously approved, the purchase of $2.2 million or 10 percent participation interest of a $22,001,250 loan to **L.C.**, originated by One Georgia Bank.  The loan was for the development of a 250 acre tract into 331 individual single-family lots. Approving this loan participation violated the Loan Policy, underwriting requirements, and safe and sound banking practices in at least the following respects: the Bank failed to perform any independent due diligence whatsoever prior to purchasing the loan participation; borrower was not valid repayment source; the lack of any presale contracts for homes; lack of independent credit analysis of either the borrower or guarantors with the requisite cash flow projections, debt service analysis, review of financial statements and tax returns, market or subdivision analysis, and; failed to perform an independent appraisal or appraisal review with loan-to-value analysis.  The negligent and grossly negligent approval of the loan participation resulted in substantial damages to the Bank and

FDIC-R in an amount to be proved at trial.

50.    On September 25, 2007, Taylor presented, and Jett, Joy, Pannu, Patel, and Rubin unanimously approved, the purchase of a $2.2 million or 48.46 percent participation interest in a $4,540,000 loan to **H.C.**, originated by Alpha Bank and Trust.  The loan was made to a new entity for the acquisition and development of a 26-acre parcel into a retail center.  Approving this loan participation violated the Loan Policy, underwriting requirements, and safe and sound banking practices in at least the following respects: the Bank failed to perform any independent due diligence prior to purchasing the loan participation; the lack of an independent credit analysis of either the borrower or guarantors with the requisite cash flow projections, debt service analysis, review of financial statements and tax returns, and; failed to perform an independent appraisal, appraisal review with loan-to-value analysis or obtain an appraisal prior to approving the purchase.  The negligent and grossly negligent approval of the loan resulted in substantial damages to the Bank and FDIC-R in an amount to be proved at trial.

51.    On September 25, 2007, Taylor presented, and Jett, Joy, Pannu, Patel, and Rubin unanimously approved, the purchase of a $2.2 million participation interest in a $7 million guidance line for residential construction issued by Alpha Bank to **W.B.**  The loan was to be secured by a first deed to secure debt on lots

under construction.  Approving this loan participation violated the Loan Policy, underwriting requirements, and safe and sound banking practices in at least the following respects: the Bank failed to perform any independent due diligence whatsoever prior to purchasing the loan participation, as evidenced by Taylor's wholesale adoption by reference of the Alpha Bank & Trust credit memorandum; Taylor failed to perform an independent credit analysis of either the borrower or guarantors with the requisite cash flow projections, debt service analysis, review of financial statements and tax returns, market or subdivision analysis, and; Taylor failed to perform an independent appraisal or appraisal review with loan-to-value analysis.  In early 2008, guarantor T.W. filed for bankruptcy.  The negligent and grossly negligent approval of the loan resulted in substantial damages to the Bank and FDIC-R in an amount to be proved at trial.

52.    Based upon the Defendants' negligent and grossly negligent conduct in connection with the foregoing transactions, the FDIC-R has been harmed.  With respect to each Defendant, as a result of that Defendants' negligence and gross negligence, the FDIC-R seeks damages in at least the following amounts: Thompson - $7.3 million; Taylor - $6.5 million; Bahl - $1.68 million; Jett - $6.5 million; Joy - $7.3 million; Pannu - $6.8 million; Patel - $7.3 million; and Rubin - $5.7 million.

## V.     CAUSES OF ACTION

### COUNT I

### ORDINARY NEGLIGENCE UNDER GEORGIA LAW

53.     The FDIC-R re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 52 above as if fully set out in this count.

54.     Each of the Defendants owed AUB a duty of care under common law, O.C.G.A. §§ 7-1-490, 51-1-2, and other facets of Georgia law, to exercise the diligence, care, and skill that ordinarily prudent persons would exercise under similar circumstances in like position.  Also, each Defendant agreed and was obligated by statute, contract and/or common law to diligently and honestly administer the affairs of the Bank, and was under a duty to ensure that the Bank operated in compliance with all laws, rules and regulations, as well as all applicable rules and regulations of the Bank.  The Defendants, collectively and individually, owed to the Bank the highest duty of due care and diligence in the management and administration of the affairs of the Bank, in the use and preservation of its assets and property, and in the adoption and carrying out of banking practices that were safe, sound and prudent.

55.     Defendants are not entitled to the application of the business judgment rule, because none of the Defendants' actions or inactions which are the basis of

24

this negligence claim were taken in good faith, nor were the Defendants reasonably well-informed in taking such actions or inactions because each of the Defendants ignored regulator's warnings regarding loan underwriting and risk management deficiencies (¶ 36),  repeatedly approved loans in violation of the Loan Policy and Parts 364 and 365 of the FDIC's Rules and Regulations (¶¶ 39-52), and by exposing the Bank to undue risk by over concentrating in CRE/ADC loans and purchasing participations without adequate risk management controls (¶¶ 25-38), despite regulator warnings related thereto (¶ 36).

56.    Defendant Thompson, as President, CEO, and a Director, among other duties, was responsible for the overall management of the Bank including, but not limited to, ADC/CRE lending, and had the obligation to exercise the degree of diligence, care, and skill that ordinarily prudent persons in like positions would exercise under similar circumstances in management, oversight and conduct of the Bank's lending function.  These duties included, but were not limited to, ensuring: that the Bank had adequate policies, procedures and internal controls relating to, among other things, ADC/CRE lending; that the Bank adhered to its lending and credit policies, loan approval process and loan and credit administration practice; that the Bank complied with banking statutes/regulations; that the Bank did not make imprudent loans and extensions of credit as part of a plan to unreasonably

grow the Bank, and; that he approved loans and purchased participations that complied with the Bank's Loan Policy and prudent and sound lending practices. He was also responsible for supervising various officers, including but not limited to, Defendant Taylor.  Thompson, in fact, possessed greater skill, knowledge, and intelligence in regards to banking practices and, as such, should be held to the standard of an ordinarily prudent person possessing these superior attributes.

57.    Defendant Taylor, as Senior Vice President and Chief Lending Officer, among other duties, reported to Defendant Thompson and was responsible for ADC/CRE lending and had the obligation to exercise a degree of diligence, care, and skill that ordinarily prudent persons in like positions would exercise under similar circumstances in management, oversight and conduct of the Bank's lending activities.  These duties included, but were not limited to, ensuring: that the Bank had adequate loan policies, procedures and internal controls relating to, among other things, ADC/CRE lending and loan participation purchases and sales; that the Bank adhered to its policies, procedures and controls, and; that the Bank complied with banking statutes/regulations and prudent and sound lending practices.

58.    By their actions and inactions, as described specifically and generally herein, Defendants Thompson and Taylor, as officers of the Bank, repeatedly

failed and neglected to perform their respective duties with due care and diligence and took actions and made decisions without being reasonably informed and without regard to the risks, constituting breaches of their statutory and common law duties of care, as follows:

a.     As to Defendant Thompson, his negligence and grossly negligent acts included, without limitation:

(i)     Failing to ensure that the Bank's ADC/CRE lending and loan participations complied with the Bank's policies and procedures, banking statutes and regulations, and prudent and sound lending practices;

(ii)     Failing to monitor and supervise subordinate officers and employees of the Bank with respect to the ADC/CRE lending;

(iii)     Installing Defendant Taylor as the CLO even though he was unqualified for the position;

(iv)     Disregarding and failing to take appropriate steps to address criticisms and warnings by regulators with respect to the Bank's ADC/CRE lending and loan participations;

(v)     Failing to ensure that ADC/CRE loans made by the Bank were safe, sound, and reasonable, and that the Bank had a reasonable prospect of being repaid by the debtors;

(vi)    Recklessly permitting the pursuit of a high-risk stratagem on an over concentration of speculative, high risk, and poorly underwritten ADC/CRE loans;

(vii)   Failing to implement and follow sound underwriting and credit administration practices;

(viii)  Failing to implement prudent risk management strategies;

(ix)    Approving loans and loan participations which violated the Bank's Loan Policy and sound and prudent underwriting standards;

(x)     Failing to ensure that Bank management followed the Loan Policy, and;

(xi)    Failing to properly supervise, manage, and oversee the Bank's loan operations.

b.      As to Defendant Taylor, his negligent and grossly negligent acts included, without limitation:

(i)     Failing to ensure that the Bank's ADC/CRE lending complied with the Bank's policies and procedures, banking statutes and regulations, and prudent and sound lending practices;

(ii)    Disregarding and failing to take appropriate steps to address criticisms and warnings by regulators with respect to the Bank's

ADC/CRE lending and loan participations;

       (iii)   Failing to ensure that ADC/CRE loans made by the Bank were safe, sound, and reasonable, and that the Bank had a reasonable prospect of being repaid by the debtors;

       (iv)   Recklessly permitting the pursuit of a high-risk stratagem on an over concentration of speculative, high risk, and poorly underwritten ADC/CRE loans;

       (v)   Failing to implement and follow sound loan underwriting and credit administration practices;

       (vi)   Failing to implement prudent risk management strategies;

       (vii)  Failing to follow the Bank's loan policy and failing to ensure that Bank management followed the loan policy;

       (viii) Failing to properly supervise, manage, and oversee the Bank's loan operations, and;

       (ix)   Underwriting and recommending loans for approval that were in violation of the Bank's Loan Policy and/or that had not been properly underwritten.

     59.   In addition to the duties set forth in paragraph 54 above, Director Defendants had the duty under Georgia law to ensure that the Bank's lending

policies, banking regulations, prudent loan underwriting and credit administration practices were followed and to take reasonably prudent steps to ensure that the Bank did not make imprudent loans or extensions of credit as part of a plan to unreasonably grow the Bank, and to exercise ordinary care and diligence in the administration of the affairs of the Bank, including, but not limited to, the following:

a.      Informing themselves about proposed loans and loan participations and the risks posed to the Bank before they approved them;

b.      Exercising independent judgment in connection with the review and approval or disapproval of loans and loan participations;

c.      Confirming that any loans they approved were underwritten in a safe and sound manner;

d.      Ensuring that any loans they approved were secured by sufficiently valuable collateral and had sufficient repayment sources to prevent or minimize the risk of loss to the Bank;

e.      Not approving loans that exceeded the Bank's relevant concentration limits without adequate capital and other safeguards in place to mitigate the added risk of loss, and;

f.      Ensuring that any loans approved did not violate applicable

banking regulations.

60.     By their common actions and inactions, as described specifically and generally herein, Defendants Bahl, Jett, Joy, Pannu, Patel, and Rubin, as directors of the Bank and members of the LC, collectively failed and neglected to perform their respective duties with due care and diligence and took actions and made decisions without being reasonably informed and without regard to the risks, constituting breaches of their statutory and common law duties of care, as follows:

a.     Failing to ensure that the Bank's lending complied with the Bank's policies and procedures, banking statutes and regulations, and prudent and sound lending practices;

b.     Failing to monitor and supervise the officers and employees of the Bank with respect to ADC/CRE lending;

c.     Disregarding and failing to take appropriate steps to address warnings and criticisms by regulators with respect to the Bank's ADC/CRE lending and loan participations;

d.     Failing to inform themselves about the risks that the credit transactions posed to the Bank before they approved them;

e.     Failing to exercise independent judgment in connection with the review and approval or disapproval of credit transactions;

f. Failing to ensure that the loans approved and/or ratified by the LC were safe, sound, and reasonable, and that the Bank had a reasonable prospect of being repaid by the debtors;

g. Failing to confirm that the extensions of credit were underwritten in a safe and sound manner;

h. Failing to ensure that the credit transactions were secured by sufficiently valuable collateral and had sufficient repayment sources to prevent or minimize the risk of loss to the Bank;

i. Approving credit transactions that caused the Bank to exceed the Bank's relevant concentration limits;

j. Recklessly permitting the pursuit of a high-risk stratagem on an over concentration of speculative, high risk, and poorly underwritten ADC/CRE loans;

k. Failing to implement and require bank officers to follow sound loan underwriting and credit administration practices;

l. Failing to implement and monitor prudent risk management strategies;

m. Allowing officers of the Bank repeatedly to violate the Bank's loan policy, and approving and/or ratifying loans that were in material violation of

the Bank's Loan Policy, and;

n.    Approving loans and loan participations which violated the Bank's Loan Policy and sound and prudent underwriting standards.

61.    With regard to each Director Defendant, the general acts of negligence and gross negligence applicable to each Director Defendant are set forth in paragraphs 25 to 38 and 60.  In addition, specific deficiencies and violations relating to the approval of illustrative loans which are applicable to each Defendant and identified within paragraphs 39 to 52.

62.    As a direct and proximate result of the Defendants' negligence, the FDIC-R suffered compensatory damages in an amount to be proven at trial.

63.    With respect to their negligent actions and inactions, Defendants pursued a common plan or design, or otherwise acted in a common or concerted manner, and therefore, each Defendant is jointly and severally liable for all Damages.

## COUNT II

## GROSS NEGLIGENCE CLAIMS UNDER 12 U.S.C. § 1821(k)

64.    Plaintiff re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 52 above as if fully set out in this count.

65.    Section 1812(k) of the Financial Institutions Reform, Recovery and

33

Enforcement Act ("FIRREA"), 12 U.S.C. § 1821(k), provides that directors and officers of failed financial institutions may be held liable to FDIC-R receiverships for loss or damage caused by their "gross negligence," as defined by applicable state law.  Georgia law defines "gross negligence" as the absence of that degree of care which every man of common sense, however inattentive he may be, exercises under the same or similar circumstances.

66.    In the alternative, the acts or omissions of each of the Defendants, as described particularly in paragraphs 25 to 52 and 60 of this Complaint, and especially for Damages occurring after the Defendants were warned by regulators, as set forth in paragraph 36, of over concentration of ADC and CRE loans, deficiencies in loan underwriting and credit administration, and deterioration of the housing market, which warnings were effectively ignored, demonstrate the failure to exercise that degree of care that every person of common sense, however inattentive that person may be, exercises under the same or similar circumstances, or lack of the diligence that even careless persons are accustomed to exercise.

67.    Each of the Defendants acted with gross negligence in operating the lending function of the Bank as follows:

a.    Defendant Thompson, by, among other things: failing to comply with the Bank's Loan Policy; allowing an unqualified person serve as CLO

despite GDBF's rejection of that person as unqualified; disregarding regulators' warnings and criticisms regarding loan underwriting, risk management and loan concentrations (¶ 36); failing to ensure that loans and loan participations were underwritten in a safe and sound manner; approving loan, credit extension transactions and loan participations that failed to comply with the Bank's policy and safe and sound lending practices, (¶¶ 39-52) and; allowing the Bank's loan portfolio to be over concentrated in speculative ADC/CRE loans in order to rapidly grow the Bank without adequate risk management controls.  (¶¶ 25-38).

      b.     Defendant Taylor, by, among other things: failing to comply with the Bank's Loan Policy; disregarding regulators' warnings and criticisms regarding loan underwriting, risk management and loan concentrations (¶ 36); failing to ensure that loans and loan participations were underwritten in a safe and sound manner; originating and recommending for approval loan and credit extension transactions that failed to comply with the Bank's policy and safe and sound lending practices, (¶¶ 39-52); and allowing the Bank's loan portfolio to be over concentrated in speculative ADC/CRE loans, (¶¶ 25-38).

      c.     Each Director Defendant as a member of the LC, by and among other things, engaged in a common pattern and practice of: failing to conduct proper due diligence and to be reasonably well informed prior to approving loans

and loan participations; failing to comply with the Bank's Loan Policy; disregarding regulators' warnings and criticisms (¶ 36); failing to ensure that loans and loan participations were underwritten in a safe and sound manner, (¶¶ 39-52); and, allowing the Bank's loan portfolio to be over concentrated in speculative ADC/CRE loans, (¶¶ 25-38).

68.     As a direct and proximate result of the Defendants' gross negligence, the FDIC-R has suffered Damages in an amount to be proven at trial.

69.     With respect to their grossly negligent actions and inactions, the Defendants pursued a common plan or design, or otherwise acted in a common or concerted manner, and therefore, each Defendant is jointly and severally liable for all Damages.

## VI.    <u>REQUEST FOR RELIEF</u>

70.     Pursuant to Federal Rule of Civil Procedure 38, the FDIC-R demands a trial by jury on all claims.

**WHEREFORE**, Plaintiff Federal Deposit Insurance Corporation, as Receiver for American United Bank, requests entry of judgment in its favor against Defendants as follows:

1.     For compensatory damages, jointly and severally, of at least $7.3 million, and any excess amount as may be proved at trial;

2.      For its costs of suit against all Defendants;

3.      For prejudgment and other appropriate interest pursuant to 12 U.S.C. § 1821(l), and;

4.      Such other and further relief as the Court deems just and proper.

This 17th day of October, 2012.

s/ David L. Turner
David L. Turner
Georgia. Bar No. 004530
Joseph L. Kelly
Georgia Bar No. 412967
Abby von Fischer-Benzon
Georgia Bar No. 542723

**Attorneys for Plaintiff Federal Deposit Insurance Corporation as Receiver for American United Bank**

Schulten Ward & Turner, LLP
260 Peachtree Street, N.W.
Suite 2700
Atlanta, Georgia 30303
404-688-6800 (Telephone)
404-688-6840 (Facsimile)